**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION
Case No. 08–20916–CR–GRAHAM**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**vs.**

**HELIO CASTRONEVES,
KATIUCIA CASTRONEVES, and
ALAN R. MILLER,**

     **Defendants.**

_____

**MOTION OF DEFENDANT ALAN R. MILLER
FOR JUDGMENT OF ACQUITTAL**

     Pursuant to Federal Rule of Criminal Procedure 29(a), Defendant Alan R. Miller, through undersigned counsel, moves the Court to enter a judgment of acquittal for him on Counts One, Three, Four, and Five of the Indictment.

     Pursuant to local rule, Mr. Miller's undersigned counsel has contacted Assistant United States Attorney Matthew Axelrod, who has advised that the government is opposed to the motion.

Case No. 08-20916-CR-GRAHAM

Respectfully submitted,

   _/s/ Lilly Ann Sanchez_____
LILLY ANN SANCHEZ
Fla. Bar ID No. 0195677
FOWLER WHITE BURNETT P.A.
Espirito Santo Plaza
14th Floor
1395 Brickell Avenue
Miami, Florida  33131-3302
Tel. (305) 789-9279
Fax (305) 789-9201
lsanchez@fowler-white.com

Robert S. Bennett
Carl S. Rauh
David B. Leland
David W. Foster
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC  20005
Tel. (202) 371-7000
Fax (202) 393-5760

*Attorneys for Defendant Alan R. Miller*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 26, 2009, the foregoing document was electronically filed with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


 _/s/ Lilly Ann Sanchez_____
Lilly Ann Sanchez

# TABLE OF CONTENTS

**PAGE**

ARGUMENT ...................................................................................................... 2

I.  THE COURT MUST ENTER A JUDGMENT OF ACQUITTAL WHERE THE GOVERNMENT FAILS TO PROVE EVERY ELEMENT OF THE CHARGED CRIMES BEYOND A REASONABLE DOUBT. ......................................................... 2

II.  THE GOVERNMENT HAS NOT INTRODUCED ANY EVIDENCE THAT ALAN MILLER TOOK PART IN THE COIMEX TRANSACTION, THE ALLEGED FAILURE TO REPORT IN-KIND INCOME FROM HUGO BOSS AND TAM AIRLINES, OR THE ALLEGEDLY IMPROPER DEDUCTIONS TAKEN BY CASTRONEVES RACING. ....................................................................... 4

III.  THE GOVERNMENT HAS FAILED TO OFFER EVIDENCE THAT ALAN MILLER AGREED TO VIOLATE THE LAW THROUGH THE PENSKE RACING TRANSACTION. ........................................................................................ 5

  A.  No Reasonable Juror Could Conclude that Alan Miller Agreed to Join an Alleged Conspiracy to Defraud the United States. ................................................ 5

    1.  There Is No Evidence that Alan Miller Agreed to Use Seven Promotions to Defraud the United States. ................................................... 5

      a.  The Evidence the Government Has Introduced Proves that Alan Miller Did Not Agree to Defraud the United States. ............. 8

        i.  Alan Miller Prevented Payment from Penske Racing to Seven Promotions for Business Reasons, Not Tax Reasons. ............................................................. 9

        ii.  There Is No Evidence Miller Said He Took Action on December 15 Because of a "Dispute" Between Helio and Seven Promotions. .......................................... 10

        iii.  The Government's Theory that Alan Miller Agreed to Defraud the United States Defies Logic. ....................... 11

      b.  The Government Has Not Introduced Evidence To Prove that Helio Castroneves Owned Seven Promotions. ...................... 13

      c.  The Government Has Not Introduced Any Evidence that Miller Was Told, Knew, or Believed that Seven Promotions Was a Nominee Corporation on Helio's Behalf ........................... 17

      d.  There Is Ample Evidence Contradicting the Government's Allegation that Miller Lied to Feingold & Alpert Regarding the Ownership of Seven Promotions ........................................... 18

2.      In Sum, the Government Has Failed to Show the Most Essential
        Element of a Conspiracy – an Agreement to Break the Law. ................. 22

B.      The Government Has Not Introduced Sufficient Evidence that the Acts
        Alan Miller Did Agree to Take On Behalf of the Castroneveses Were
        Illegal. ................................................................................................. 23

IV.     THE GOVERNMENT HAS FAILED TO PROVE THAT ALAN MILLER
        AIDED AND ABETTED HELIO CASTRONEVES'S ALLEGED TAX
        EVASION. ................................................................................................... 24

        A.      The Government Has Failed to Prove Beyond a Reasonable Doubt the
                Existence of a Tax Deficiency. .......................................................... 24

        B.      The Government Has Not Proved that Alan Miller Acted Willfully.  No
                Reasonable Juror Could Find Miller Failed to Act in Good Faith. .................... 25

V.      THE COURT SHOULD DECLINE THE GOVERNMENT'S INVITATION TO
        BREAK FROM PRECEDENT BY APPLYING THE GOVERNMENT'S
        EXPANSIVE AND NOVEL THEORY OF CONSTRUCTIVE RECEIPT FOR
        THE FIRST TIME ON FACTS LIKE THESE IN A CRIMINAL CASE. ...................... 28

CONCLUSION ............................................................................................................. 30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION
Case No. 08−20916−CR−GRAHAM

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

HELIO CASTRONEVES,
KATIUCIA CASTRONEVES, and
ALAN R. MILLER,

     Defendants.

_____/

MEMORANDUM IN SUPPORT OF
MOTION OF DEFENDANT ALAN R. MILLER
FOR JUDGMENT OF ACQUITTAL

     Pursuant to Federal Rule of Criminal Procedure 29(a), Defendant Alan R. Miller,
through undersigned counsel, moves the Court to enter a judgment of acquittal for him on Counts
One, Three, Four, and Five of the Indictment for the following reasons, as is more fully
developed herein:

- The government must prove beyond a reasonable doubt that a conspiracy existed and that Alan Miller agreed to join it.  It has totally failed to prove either point. No reasonable juror could conclude beyond a reasonable doubt that Alan Miller agreed to defraud the United States, so the Court must enter a judgment of acquittal on the counts in which he is charged.

- The only charges against Alan Miller relate to the transaction between Penske Racing and Seven Promotions.  The government has neither alleged nor proven that Alan Miller played any role in the Coimex transaction, the alleged failure to report income from Hugo Boss or TAM Airlines, or the allegedly improper deductions taken by Castroneves Racing.

- No reasonable juror could find beyond a reasonable doubt that Alan Miller agreed to defraud the United States. The government has presented no evidence that Alan Miller made any such agreement. No witness statement. No wiretap. No formal agreement. No email suggesting an agreement. No file memo laying out an agreement. No handwritten note of an agreement's terms. Nothing. The government has likewise presented no evidence that Alan Miller agreed to do anything illegal.

- No reasonable juror could find beyond a reasonable doubt that Alan Miller aided and abetted tax evasion. The government has failed to prove beyond a reasonable doubt the existence of a tax deficiency with respect to the Penske Racing transaction. It has also failed to prove beyond a reasonable doubt that Alan Miller willfully aided and abetted the evasion of taxes (in other words, that he did not act in good faith). There is no evidence that Alan Miller had anything to do with the tax returns involved in the case, nor is there any evidence that he provided input for them.

- The government's own witnesses have undercut the government's theory that there was a conspiracy and that Alan Miller agreed to join it.

- The government's own witnesses have established that Alan Miller is a man of integrity and high ethics.

- The government and the IRS are asking the Court to do something that has never been done before – to apply the doctrine of constructive receipt, which decades of court decisions have held should be "sparingly used", in a criminal context where the fact do not warrant it. Having heard the government's evidence in this case, the Court should not sanction this break from precedent.

## ARGUMENT

## I.   THE COURT MUST ENTER A JUDGMENT OF ACQUITTAL WHERE THE GOVERNMENT FAILS TO PROVE EVERY ELEMENT OF THE CHARGED CRIMES BEYOND A REASONABLE DOUBT.

The Constitution requires the government to prove every element of the crimes charged against Mr. Miller beyond a reasonable doubt. *United States v. Gaudin*, 515 U.S. 506, 510 (1995). The Court therefore must enter a judgment of acquittal for Mr. Miller if it concludes that a reasonably minded juror must have a reasonable doubt as to the existence of any of the

essential elements of the crimes charged.  *United States v. Berrera*, 547 F.2d 1250, 1255 (5th Cir. 1977).[1]

        In weighing whether the government has presented sufficient evidence to warrant submission of the charges against Mr. Miller to the jury, the Court must give the government the full benefit of the evidence and any reasonable inferences to be drawn therefrom.  *United States v. Grigsby*, 111 F.3d 806, 833 (11th Cir. 1997).  The government may rely on circumstantial evidence, and the government's proof need not exclude every hypothesis except guilt.  *See United States v. Moore*, 504 F.3d 1345, 1348 (11th Cir. 2007).

        Nonetheless, the deference owed to the government in reviewing a Motion for Judgment of Acquittal is not without limits.  In making its case, the government cannot rely on unreasonably attenuated inferences.  *See United States v. Villegas*, 911 F.2d 623, 628 (11th Cir. 1990).  "[T]he ultimate burden on the government is the ability to draw a reasonable inference, and not a speculation, of guilt."  *Villegas*, 911 F.2d at 628.  In evaluating the inferences that can be drawn from the evidence, the Court must not "indulge in fanciful speculation or bizarre reconstruction of the evidence.  Moreover, [the] Court is not required to view the evidence through dirty window panes and assume that evidence which otherwise can be explained as equally innocent must be evidence of guilt."  *United States v. Recognition Equipment Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989).

---

[1]    In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit.  *Id.* at 1209.

## II. THE GOVERNMENT HAS NOT INTRODUCED ANY EVIDENCE THAT ALAN MILLER TOOK PART IN THE COIMEX TRANSACTION, THE ALLEGED FAILURE TO REPORT IN-KIND INCOME FROM HUGO BOSS AND TAM AIRLINES, OR THE ALLEGEDLY IMPROPER DEDUCTIONS TAKEN BY CASTRONEVES RACING.

The government has not at any point introduced any evidence, or even alleged, that Alan Miller played any role in the following transactions:

1.  The sponsorship payments made by Coimex Internacional.

2.  The alleged failure to report in-kind income from Hugo Boss and TAM Airlines.

3.  The allegedly improper deductions taken by Castroneves Racing for payments to Brazil.

Alan Miller repeatedly noted this fact in his pre-trial filings. *See, e.g.*, Defendant Alan R. Miller's Motion to Dismiss Him from Counts One, Three, Four, and Five of the Indictment, at 3 n.1 (D.E. 120) ("[T]he Indictment allege[s] tax evasion based on (1) transactions between Seven Promotions and Coimex Internacional SA, (2) the alleged failure by Helio Castroneves to report income received from sponsors, (3) the alleged claim by Helio Castroneves of improper deductions. Mr. Miller is not alleged to have participated in, or even known about, these alleged acts of evasion.").

The evidence offered by the government in its case-in-chief has proved that Alan Miller took no criminal action with respect to these groups of alleged crimes:

- **Coimex**: Six witnesses testified regarding the Coimex sponsorship: Pat Bell, Kevin Savoree, and Jill Coombes from Larsson, Woodyard & Henson ("LWH"); Cesar Nascimento from Safra Bank; Monica Sionara Schpallir Calijuri from Brazil; and Dan Luginbuhl of Penske. None of these individuals alleged that Alan Miller played any role in the Coimex transaction.

- **Hugo Boss and TAM Airlines**: Four witnesses testified regarding Helio Castroneves's alleged failure to report in-kind income: Pat Bell and Jill Coombes from LWH, Richard Presser from Hugo Boss, and Mary Casey-Pinto from TAM

Airlines.  None alleged that Alan Miller played any role in the alleged failure to report this in-kind income.

- **Deductions for Payments to Brazil**:  Pat Bell and Jill Coombes from LWH testified regarding the allegedly improper deductions taken by Castroneves Racing for payments to Brazil.  The only evidence regarding Alan Miller on this issue was testimony that Mr. Miller stated during one brief telephone call his impression that the payments should not be treated as expenses.  *See* Bell Testimony, at p. 55.  (D.E. 274.)  This uncontradicted evidence shows that Miller took the position that the government is now arguing was correct.

Given the absence of any evidence of Alan Miller's involvement in these matters, no reasonable juror could conclude that Alan Miller broke the law with respect to the Coimex transaction, the alleged in-kind income from sponsors, or the allegedly improper deductions for Brazil payments.  The government has not introduced sufficient evidence to permit those allegations to be submitted to the jury.

## III.    THE GOVERNMENT HAS FAILED TO OFFER EVIDENCE THAT ALAN MILLER AGREED TO VIOLATE THE LAW THROUGH THE PENSKE RACING TRANSACTION.

### A.    No Reasonable Juror Could Conclude that Alan Miller Agreed to Join an Alleged Conspiracy to Defraud the United States.

#### 1.    There Is No Evidence that Alan Miller Agreed to Use Seven Promotions to Defraud the United States.

In over 150,000 pages of discovery and weeks of live testimony, there has been no evidence that Alan Miller agreed to join a conspiracy to defraud the United States or entered into an agreement to break the law.  The government's three-year investigation and the Court's ruling piercing attorney-client privilege have not revealed a shred of evidence that Alan Miller agreed to help a client cheat the government.  No witness statement.  No wiretap.  No formal agreement.  No email suggesting an agreement.  No file memo laying out the agreement.  No handwritten note of an agreement's terms.  Nothing.

5

The government's conspiracy theory is that Helio Castroneves owned, either legally or beneficially, Seven Promotions, (an allegation it has not proven) and that Alan Miller agreed with him and others to conceal this fact so that they could channel money to Seven Promotions to help Helio Castroneves evade U.S. income taxes.  The government alleges that Alan Miller knew about Helio's ownership of Seven Promotions and furthered the conspiracy by concealing it from Helio's accountants and other tax advisors and by making false representations to Feingold & Alpert to improperly procure a tax opinion blessing the Fintage transaction.  The government's theory fails as a matter of law because there is no evidence that Alan Miller agreed to any such illegal acts or that he had any intent to make an alleged illegal conspiracy succeed.

To place the conspiracy charge before the jury, the government must prove beyond a reasonable doubt that a conspiracy existed, that Alan Miller knew of the alleged conspiracy, and that he voluntarily joined it.  *See United States v. Hernandez*, 896 F.2d 513, 518 (11th Cir. 1990).  In other words, Alan must have "willfully associate[d] himself in some way with the criminal venture and willfully participate[d] in it as he would in something he wished to bring about."  *United States v. Newton*, 44 F.3d 913, 922 (11th Cir. 1995).  The government must prove that Alan joined the conspiracy "with the intent to commit the offenses that were its objectives, that is, with the affirmative intent to make the conspiracy succeed."  *United States v. Ceballos*, 340 F.3d 115, 123-24 (2d Cir. 2003) (internal citations omitted).  "Proof of a true agreement is the only way to prevent individuals who are not actually members of the group from being swept into the conspiratorial net."  *United States v. Chandler*, 388 F.3d 796, 806 (11th Cir. 2004).

The Court is to scrutinize accusations of conspiracy with special care, for "'charges of conspiracy are not to be made out by piling inference upon inference.'" *Anderson v. United States*, 417 U.S. 211, 224 (1974) (quoting *Direct Sales v. United States*, 319 U.S. 703, 711 (1943)). The Court must look at the evidence as a whole, including evidence contrary to the government's theory of the case. *See United States v. Schuchmann*, 84 F.3d 752, 754 (5th Cir. 1996). The Eleventh Circuit has repeatedly noted that it "cannot sanction a conspiracy conviction based on 'conjecture.'" *See, e.g.*, *United States v . Toler*, 144 F.3d 1423, 1433 (11th Cir. 1998). For that reason, mere association with other alleged conspirators is insufficient to prove participation in a conspiracy. *United States v. Sullivan*, 763 F.2d 1215, 1218 (11th Cir. 1985).

The substantive and procedural rules governing conspiracy charges offer prosecutors strong incentives to charge those who have any contact with the conspirators. For example, the Eleventh Circuit's treatment of severance motions allows the government to charge co-conspirators without the expense of an additional trial, and the hearsay exception for statements of alleged co-conspirators, *see* Fed. R. Evid. 801(d)(2)(E), allows the government to introduce evidence that would otherwise be excluded. Furthermore, bringing conspiracy charges against the associates of alleged conspirators undermines any exculpatory testimony (such as an advice-of-counsel defense) they might offer.[2] The Eleventh Circuit has repeatedly reversed convictions of the associates of alleged conspirators for insufficient evidence. *See, e.g.*, *United States v. Toler*, 144 F.3d 1423, 1433 (11th Cir. 1998) (finding insufficient evidence for

---

[2]   In this case, the government would no doubt argue that any exculpatory testimony by Alan Miller on behalf of the Castroneves defendants is not credible because of the charges pending against Mr. Miller. Counsel for Mr. Miller represented to the Court before trial that Mr. Miller would likely testify. However, in light of the weakness of the government's case and the Eleventh Circuit's rules regarding appellate review of Rule 29 motions, Mr. Miller is reevaluating whether to present a defense at all. If this motion were granted, Alan Miller would testify if he were called.

conspiracy conviction against associate of other convicted conspirators); *United States v. Newton*, 44 F.3d 913, 921-22 (11th Cir. 1995) (same); *United States v. Awan*, 966 F.2d 1415, 1435 (11th Cir. 1992) (same); *Villegas*, 911 F.2d at 628 (same); *Hernandez*, 896 F.2d at 519-520 (same).

The conspiracy count in the Indictment (Count One) alleges "that Helio Castroneves, Katiucia Castroneves, and Alan Miller used an offshore Panamanian shell corporation, Seven Promotions, to conceal and disguise the true and correct amount of Helio Castroneves's income from Internal Revenue Service." Indictment, at p. 6 ¶ 3. (D.E. 1.) If that statement left any doubt what the government alleged the three defendants conspired to do, the government's pre-trial filings swept that doubt away:

> The conspiracy is as follows: "Helio Castroneves, Katiucia Castroneves, and Alan R. Miller used an offshore Panamanian shell corporation, Seven Promotions, to conceal and disguise the true and correct amount of Helio Castroneves' income from the Internal Revenue Service." (DE 1 at 6.) That's it. That's the conspiracy—the agreement of the three to hide Helio Castroneves' income from the IRS by using Seven Promotions.

Government's Response to Defendant Alan R. Miller's Motion to Dismiss Count One for Misjoinder Under Rule 8(b) and for Severance from His Co-Defendants Under Rule 14(a), at p. 2. (D.E. 150.) Having adamantly insisted on the nature and object of the conspiracy, now "the government must prove the conspiracy it charged in the indictment rather than some other conspiracy." *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998).

### a. The Evidence the Government Has Introduced Proves that Alan Miller Did Not Agree to Defraud the United States.

The government's own evidence is entirely inconsistent with its theory that Alan Miller agreed with the Castroneveses to defraud the United States through the use of Seven Promotions. On December 15, 1999, before any payments to Seven Promotions were due or made, Miller took actions that were completely inconsistent with any plan to use Seven Promotions to evade taxes. On that day, Miller wrote to Penske Racing and instructed it not to

make any payments under the Licensing Agreement to Seven Promotions.   Miller thereby

ensured that the alleged "Panamanian shell corporation" Seven Promotions never received a red

cent of the money due under the Licensing Agreement.   According to the general counsel of

Penske Racing, Larry Bluth, Alan Miller was the <u>only</u> reason that all of the money under the

Licensing Agreement was not paid to Seven Promotions:

> Mr. Bennett:   It was Mr. Miller, wasn't it, that stopped millions of dollars from going to Seven Promotions?
>
> Mr. Bluth:       Yes.
>
> Mr. Bennett:   Had Mr. Miller not directed you not to send the money to Seven Promotions, it would have been sent; isn't that correct?
>
> Mr. Bluth:       It would have been sent, but we would have to examine whether there would be a withholding requirement.
>
> Mr. Bennett:   Yes.   But it was Mr. Miller who said, don't send the money to Seven, right?
>
> Mr. Bluth:       Yes.

Bluth Testimony, p. 172, ll. 14-23.  (D.E. 275.)

> ### i.   Alan Miller Prevented Payment from Penske Racing to Seven Promotions for Business Reasons, Not Tax Reasons.

The government has attempted to explain away this evidence by claiming that

Alan Miller issued the instruction not to pay Seven Promotions to avoid imposition of a thirty

percent withholding tax.   *See* Government Opening Statement at p. 14 ll. 18-19.  (D.E. 257.)

There is no support for this accusation.   The government's own witnesses, Fred Feingold and

Mark Berg, both stated that Miller issued the instructions to Penske Racing because of concerns

about the ambiguous terms of Helio's agreement with Seven Promotions, not because of any tax

issues.  Mark Berg testified that his firm examined the contract Helio had with Seven Promotions

and found that "[t]here were some concerns we had, having reviewed the document, with such

matters as whether and when Mr. Castroneves was entitled to a payment under that document, so it – the document certainly bore out the concern that Mr. Miller had." Berg Testimony, p. 56 l. 24 – p. 57 l. 3. (D.E. 283.) Fred Feingold testified that he also shared Miller's and Berg's concerns about the contract between Helio and Seven Promotions. Feingold Testimony, p. 112 l. 21 – p. 113 l. 8. (D.E. 285.) Had Alan Miller believed that Helio Castroneves owned Seven Promotions, as the government alleges, he would have had no reason to be concerned about the ambiguities in the contract.

> **ii.** **There Is No Evidence Miller Said He Took Action on December 15 Because of a "Dispute" Between Helio and Seven Promotions.**

The Indictment twice alleges that Miller "falsely represented to tax counsel that the reason why Alan R. Miller had instructed Penske not to make payments to Seven Promotions under the Licensing Agreement was because of a dispute between Helio Castroneves and Seven Promotions over the terms of a license." Indictment at p. 9 ¶ 14; *see also id.* at p. 14 ¶ 30 (alleging that "Miller falsely represented to a New York, New York law firm that the reason why Alan R. Miller had instructed Penske not to make payments to Seven Promotions under the Licensing Agreement was because of a dispute between Helio Castroneves and Seven Promotions over the terms of a license, when he knew that there had, in fact, been no such dispute . . . ."). (D.E. 1.) During Miller's conversations with Feingold and Berg regarding the Seven Promotions agreement, Mark Berg took notes in which he characterized the ambiguities in the contract between Seven Promotions and Helio Castroneves as a "dispute." *See* 5-10-02 Berg Handwritten Notes of Phone Call with Alan Miller, Government's Exhibit No. 172. But the government was unable to show that Miller ever even used the word "dispute." Mark Berg, in whose notes the word "dispute" was found, admitted that the characterization of the problem as a "dispute" was his own and that Miller may never have used the word. *See* Berg Testimony, p.

182 ll. 9-18. (D.E. 283.) Moreover, Berg also admitted that he did not place the word "dispute" in quotation marks in his notes, as he does when he is quoting someone. *See id.* at p. 181 ll. 6-14; p. 182 ll. 12-13.

### iii. The Government's Theory that Alan Miller Agreed to Defraud the United States Defies Logic.

No reasonable juror could possibly believe that Alan Miller agreed to defraud the United States as the government has alleged. Alan Miller first met Helio and Katiucia Castroneves in Fontana, California on October 29, 1999. Miller was in Fontana because his client Greg Moore was to sign a set of contracts that allowed him to drive the following season for Penske Racing. Miller and Penske Racing had spent six months negotiating the contracts. On the morning of October 31, Greg Moore signed those contracts, but he was killed in a tragic accident during the race that afternoon.

At that point, Miller was an established and respected motor sports attorney, and Helio Castroneves was a young, unestablished driver who found himself without a job because his team had gone out of business. During the race weekend at Fontana, Castroneves was forced to scrounge for a job the following season. Penske offered him a job after Greg Moore was killed.

Castroneves contacted Alan Miller to retain Miller as his lawyer the next day. Miller and Penske Racing agreed to use the Greg Moore contracts as templates for a deal involving Helio Castroneves. Bluth Testimony at p. 184 ll. 1-4. (D.E. 275). It had taken six months to finalize the Moore contracts, but, under pressure from Penske to finalize a deal, Miller closed the Castroneves contracts in just four days. *Id.* Bluth admitted that this "press of time" could have led to errors in the drafting process. *Id.* at p. 128 ll. 6-10.

The government has failed to show any motive for Alan Miller to enter into an agreement to defraud the government of Helio Castroneves's income taxes.  Alan Miller is a 71-year-old lawyer with an unblemished record and reputation, and in 1999, Helio Castroneves was a twenty-four year old unknown.  No reasonable juror would believe that, within a couple of hours (or at most a few days) of meeting Helio, Miller agreed to take him on as a client and to help him cheat the government out of Helio's taxes.  The government has alleged that during the first week of November 1999 – in which Miller attended the funeral of his client and close friend Greg Moore – Miller risked his reputation, his career, and his freedom by agreeing to help Castroneves use Seven Promotions to defraud the United States.  The government alleges that Miller knew Castroneves owned Seven Promotions and that he agreed to lie about this fact.  The government has offered no evidence why Miller would have done this.  Alan Miller received nothing for his services to Helio Castroneves except his regular hourly fee.  No special bonus or secret payment.  Not even a percentage of the contract amount, as Helio had given his former manager, Emerson Fittipaldi.

Each of the government's key allegations against Alan Miller's is at best unproven and at worst demonstrably false.  The government has alleged that Miller instructed Penske Racing not to pay Seven Promotions because of a thirty percent withholding tax liability.  It has not proven that fact.  It has alleged that Miller lied to Feingold and Berg by telling them that Helio and Seven Promotions had a "dispute" over their contract.  It has not proven that fact.  And it has theorized that Alan Miller risked his livelihood and freedom by agreeing with the Castroneveses to defraud the United States.  It has likewise not proven that accusation.  Nor has it offered any evidence that would contradict the fact that Alan Miller was the sole reason that Seven Promotions never received any money from Penske Racing.  On these facts, no reasonable

Case No. 08-20916-CR-GRAHAM

juror could find beyond a reasonable doubt that Alan Miller agreed to use Seven Promotions to defraud the United States.

> **b.     The Government Has Not Introduced Evidence To Prove that Helio Castroneves Owned Seven Promotions.**

The government has likewise failed to prove that Helio Castroneves owned Seven Promotions.    Both the law and the witness testimony in this case make clear that Helio Castroneves owed no taxes on payments to Seven Promotions unless he owned the corporation, either legally or beneficially.[3]  *See* Feingold Testimony, p. 21 ll. 15-22; *id.* p. 61 ll. 18-22.  Thus, proof that Helio owned Seven Promotions is essential to the government's case.   Yet the government has introduced little evidence on this point, and the evidence that it has introduced shows that Helio Castroneves did <u>not</u> own Seven Promotions.

The evidence regarding the ownership of Seven Promotions comes from two sources.   First, Fernando Berguido, the Panamanian lawyer who formed Seven Promotions, testified that Seven Promotions is a bearer share corporation and that he transferred the bearer shares to Osiris Leite Correa, the Brazilian lawyer for Helio's father.   Berguido Testimony at p. 14 ll. 7-8; p. 22 ll. 16-21.  (D.E. 293.)  The stipulated testimony of Mr. Correa is that he gave the bearer shares to Helio's father and that he understood that Helio's father was the owner of Seven Promotions.  *See* Stipulation of Testimony of Osiris Leite Correa at p. 2 ¶ 6 (attached as Exhibit

---

[3]     Resident aliens like Helio Castroneves are required to report and pay taxes on their worldwide income.  *See* Treas. Reg. § 1.1-1(b).  American citizens and residents must report as income the "Subpart F income" of "controlled foreign corporations" (CFCs) in which they are "United States shareholders" and in which they own shares.  I.R.C. § 951(a).  Subpart F income includes most forms of passive income, such as royalties received for the exploitation of one's name, image, and likeness.  *Id.* § 954(c)(1)(A).  A controlled foreign corporation is one in which United States shareholders own 50% or more of the vote or value of the corporation.  *Id.* § 957(a).  And a United States shareholder is a citizen or resident who owns 10% or more of the voting power of a foreign corporation.  *Id.* § 951(b).  There is no evidence that Helio owned any shares of Seven Promotions directly.  The uncontradicted evidence is that his father owned the shares.  *See* Berguido Testimony at p. 14 ll. 7-8; p. 22 ll. 16-21 (D.E. 293); Stipulation of Testimony of Osiris Leite Correa at p. 2 ¶ 6 (attached as Exhibit A).  Because Helio's father was not a U.S. resident, any shares he owned are not attributed to Helio.  I.R.C. § 958(b)(1).  Therefore, under these rules, Helio was not required to claim Seven Promotions's Subpart F income as his own.

A).  This testimony, which is uncontradicted, shows that Helio's father, not Helio, owned Seven Promotions.

This evidence is fatal to the government's case.  To distract from that fact, the government has focused on misstatements made by Alan Miller or someone at Alan Miller's law firm.  Yet the government has offered no evidence, other than its own say-so, that these erroneous statements were anything other than innocent mistakes, or even that they were all made by Alan Miller.  *See United States v. Recognition Equipment Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989) ("[The] Court is not required to view the evidence through dirty window panes and assume that evidence which otherwise can be explained as equally innocent must be evidence of guilt.").

**Promotional Representation Agreement**:  As Alan Miller worked to negotiate and finalize contracts for Helio Castroneves to replace Greg Moore, he was under pressure from Penske to "achieve a contract fairly quickly."  Bluth Testimony at p. 184 ll. 2-3.  (D.E. 275.)  To meet this time pressure, the parties used the Moore contracts as templates for his Helio's deal. Moore had wanted all of the money earned from licensing his name, image, and likeness to be paid to a corporation he owned called Greg Moore Enterprises, Ltd. ("GME").  The Promotional Representation Agreement Moore signed stated the fact that he owned GME in a "whereas" clause toward the beginning of the contract.  To create the set of contracts governing Helio's relationship with Seven Promotions, someone at Alan Miller's firm removed the names of Greg Moore and his related entities and replaced them with Helio Castroneves's name and the entities Helio suggested.  Bluth Testimony, p. 166 ll. 10-14.  (D.E. 275.)  The person who made these changes mechanically replaced "Greg Moore Enterprises" with "Seven Promotions" in the

whereas clause.   Therefore, after these mechanical changes, one whereas clause in the Promotional Representation Agreement stated that Helio owned Seven Promotions.

There is no evidence that Alan himself prepared the Castroneves contracts or that he ever focused on the "whereas" clause that stated that Helio owned Seven Promotions.  To the contrary, Alan Miller devoted his attention to provisions of the contracts (particularly the Driver Agreement) that affected the economics of the deal with Penske Racing.  The provisions that were changed related to the financial terms of the deal or the benefits and burdens of the contract. (For example, Alan Miller removed a provision that gave Greg Moore an option to transfer to the NASCAR series because Helio Castroneves was not interested in racing in NASCAR.  *See id.* at p. 188 l. 16 – p. 189 l. 4.)  No substantive changes were made to any of the terms that did not affect the economics of the transaction, such as the up-front "whereas" clauses.

The government has asked four key tax experts, Kevin Savoree, Pat Bell, Mark Berg, and Fred Feingold, – all of whom served as prosecution witnesses – about the "whereas" clause, and none of them has been able to confirm the accuracy of the misstatement it contains.

**Fittipaldi Litigation Deposition Testimony**:  Not long after Helio Castroneves signed with Penske Racing, he was sued by Emerson Fittipaldi, his former manager. Castroneves had fired Fittipaldi just before the race in Fontana, California.  During litigation between Helio Castroneves and Emerson Fittipaldi, Alan Miller was asked in a deposition about Helio's agreements with Penske Racing.  Miller stated that Castroneves had two contracts with Penske Racing.  He described those two contracts as "a Driver's Agreement, and he has a Licensing Agreement and Promotion Agreement.  When I said he has, that isn't accurate; corporations in which he owns a controlling interest have those contracts, not directly payable to him."   Miller was asked "Who owns the corporations?"   Miller responded "He does."

Government Exhibit No. 362.  At the Fittipaldi trial, Mr. Miller corrected the erroneous statements he had made at the deposition.  He was asked directly if Helio Castroneves owned Seven Promotions.  Miller replied "No, he did not.  I either misunderstood the question or didn't hear it totally.  It's simply not a correct answer.  He owns, to my knowledge, no interest in Seven Promotions, whatsoever."  Government Exhibit No. 363.

**Letter to Guido Chipy**:  In 2001, Helio Castroneves attempted to get a loan to purchase a house in Miami from PineBank.  Guido Chipy worked for the bank, and Miller's firm sent him a loan application on behalf of Helio Castroneves.  At the end of the application was an unsigned document on Miller's firm's letterhead implying that Helio Castroneves owned Seven Promotions.  *See* Government's Exhibit No. 142.  The government offered no evidence either that Alan Miller prepared or reviewed the letter before it was sent to Chipy.[4]  Chipy Testimony, p. 71 ll. 5-17.  (D.E. 279.)  The loan never closed, so Chipy never had any reason to give Miller an opportunity to confirm the accuracy of the representation someone in his office had made in the letter.

**Larry Bluth's Testimony**:  Larry Bluth represented Penske Racing in the negotiations over both Greg Moore's and Helio Castroneves's contracts.  Larry Bluth was deposed as part of the Fittipaldi litigation in January 2003, just three years after the events now in issue.  Bluth testified under oath that he did not know if Seven Promotions was an affiliate of Helio Castroneves and that he did not know the nature of the relationship between Helio and Seven Promotions.  Bluth Testimony, p. 57 l. 10; p. 61 ll. 18-22.  (D.E. 275.)

At this trial, six years later (and almost a decade removed from the negotiation of the contracts), Bluth testified that Alan Miller told him on November 4, 1999 that Helio

---

[4]     The completion of form documents is not a task traditionally performed by senior partners in law firms.

Castroneves owned Seven Promotions. *See id.* at p. 7 l. 23. (D.E. 260.) Bluth was unable to offer any explanation for his sudden recollection. *See id.* at p. 64 l. 14. (D.E. 260.) He could not point to a document that he had reviewed or any other event that triggered his newfound memory. Given Bluth's prior testimony much closer to the events in question, he has no credibility on this point.

*     *     *

It is completely speculative to infer from these mistakes that Alan Miller agreed to defraud the United States. The misstatements are inconsistent with the government's theory that Miller was concealing Castroneves's ownership as part of the criminal conduct. If the government's theory is that there was a conspiracy to conceal the true ownership of Seven Promotions, it is inconceivable that Alan Miller would have willingly revealed this information on four separate occasions.

### c.   The Government Has Not Introduced Any Evidence that Miller Was Told, Knew, or Believed that Seven Promotions Was a Nominee Corporation on Helio's Behalf.

The evidence indicates that Helio's father, not Helio, owned Seven Promotions, and the government has not introduced evidence that Alan Miller was told, knew, or believed that Helio's father maintained that ownership, as Helio's nominee or otherwise. Berguido, the attorney who formed Seven Promotions, testified that Seven Promotions's corporate documents do not indicate that Seven Promotions had nominee officers and directors. Berguido Testimony at p. 71 ll. 2-6. (D.E. 293.) Likewise, there is no evidence that Alan Miller ever had any contact with any of the officers or directors that could have led him to believe that they were directors in name only. Fernando Berguido, who was intimately involved in the creation of Seven Promotions and the issuance of its corporate documents, could not even state whether Alan Miller was in the courtroom. *Id.* at p. 71 ll. 19-25. The government has not presented any

evidence that Alan Miller knew that Helio's father owned Seven Promotions or even that Miller

was ever aware that Helio Castroneves had a power of attorney from Seven Promotions. There

is simply no evidence that would permit a jury to conclude that Alan Miller knew that Seven

Promotion was a nominee corporation on Helio's behalf.

> **d. There Is Ample Evidence Contradicting the Government's Allegation that Miller Lied to Feingold & Alpert Regarding the Ownership of Seven Promotions**

In its opening statement, the government accused Alan Miller of lying to lawyers

at Feingold & Alpert regarding the ownership of Seven Promotions. "They lied. They told the

New York tax lawyers that Helio Castroneves didn't own Seven Promotions, when they knew

that he did." Government Opening Statement, p. 19 ll. 1-3. (D.E. 257.) The government,

however, has failed to prove this essential accusation. There is absolutely no evidence that Alan

Miller lied to the New York tax attorneys. Helio Castroneves himself told the attorneys in

person that he did not own Seven Promotions. *See* Berg Testimony, at p. 50 l. 20. (D.E. 283.)

And at Alan Miller's request, Helio sent Alan Miller a letter confirming that Helio did not own

Seven Promotions. *See* Government Exhibit No. 175. Alan provided this letter to the New York

attorneys, and he was entitled to rely on the representations of his client. As already established,

the government has not proven that Alan Miller ever knew that Helio Castroneves owned Seven

Promotions. To the contrary, the only evidence is has introduced directly on point shows that

Helio Castroneves did <u>not</u> own Seven Promotions – his father did.

Both of the New York tax lawyers, Fred Feingold and Mark Berg, testified in this

trial for the government, and neither of them backed up the government's assertion that Alan

Miller lied to them. Neither stated that Alan Miller had ever lied to them, and neither even went

so far as to say he was unsure about or did not know whether Alan Miller was always honest in

his dealings with Feingold & Alpert. In fact, their testimony was just the opposite.

**Government Witness Fred Feingold**:

Q.      In your dealings with him, your professional dealings with him, has he ever asked you to take a tax position which you felt – on behalf of one of his clients which you felt was improper?

A.      Absolutely not.

Q.      In your dealings with him professionally over these nine years, did he always make an effort, a diligent effort, to give you all of the information that you felt you needed to render an appropriate tax opinion?

A.      Yes.  And when we asked him a question and he couldn't answer it, he said, give me time, I'll try to find the information, but he always – we felt he always took care and diligence in answering our questions.

Q.      My last question of you is based on your substantial experience with him.  During those periods of time, did you always find Alan Miller to be a man of integrity and high ethics?

A.      Yes, I did.

Feingold Testimony, p. 114 ll. 1-18. (D.E. 285.)

**Government Witness Mark Berg**:

Q.      You have dealt with Mr. Miller over a period of time; is that correct?

A.      That's correct.

Q.      During the period of time that you worked with him and discussed things with him, did he ever ask you or, to your knowledge, anyone else in your firm to take a tax position that you were uncomfortable with?

A.      No, he did not.

Q.      During the period of time that you worked with Mr. Miller, do you agree that at all times he tried to get all of the facts out to you so you could write the appropriate tax opinions?

A.      That was the impression I had at the time, absolutely, yes.

19

Case No. 08-20916-CR-GRAHAM

> Q.    Do you agree with me, in all of your dealings with Alan Miller, that he was honest and displayed not only competence, but integrity?
>
> A.    Yes, that was certainly our impression.  That was the basis upon which we had dealings with him.

Berg Testimony, p. 185 l. 18 – p. 186 l. 10. (D.E. 283.)

Feingold and Berg were not the only government witnesses to vouch for Alan's honesty, credibility, and integrity.  Indeed, the government has moved to prevent Miller from presenting character testimony because its own witnesses did such a good job of proving Miller's good character that the government believes the defense's own character testimony would be redundant.  *See* Government's Motion in Limine to Exclude Certain Character Evidence and Witnesses, at p. 4.  (D.E. 287.) ("Larry Bluth and Kevin Savoree, for example, have already testified that they found Alan Miller to be honest and a man of integrity.").

**Government Witness Kevin Savoree**:

> Q.    And Alan Miller was somebody who you respected.
>
> A.    Absolutely.
>
> . . . .
>
> Q.    And Alan Miller never suggested to you that you should do something improper, right?
>
> A.    Absolutely not.
>
> . . . .
>
> Q.    And he has never given you any reason to question his honesty or integrity, has he?
>
> A.    Absolutely not.
>
> Q.    And in fact, even though he's been going through this situation here, that we're here in court here today, you continue to deal with Mr. Miller, correct?
>
> A.    That is correct.

Q.      And you found him just as honest and full of integrity as you always have.

A.      Absolutely.

Savoree Testimony, at p. 36 ll. 16-17; p. 62 ll. 14-16; p. 127 ll. 9-18.  (D.E. 267.)

**Government Witness Pat Bell**:

Q.      And in dealing with Alan Miller through the course of the years that followed from 2000, 2001, 2002 and on through, you personally found that Alan Miller was a person who gave you no reason to doubt his credibility; isn't that true?

A.      Correct.

Q.      And just - - the bottom line here was, Alan Miller was somebody that you trusted.

A.      Yes.

. . . .

Q.      Alan Miller never, ever, throughout all these years, suggested to you that you do something that you thought was not correct and proper; isn't that true?

A.      Right.

Bell Testimony at p. 70 l. 22 –p. 71 l. 4; p. 99 ll. 19-22.  (D.E. 274.)

**Government Witness Larry Bluth**:

Q.      Okay.   Now, on direct examination - - I'm sorry, on cross-examination by Mr. Black, you responded that Mr. Miller was known as an outstanding and highly respected motorsports attorney or words to that effect; is that right?

A.      That is right.

Q.      And is that your own personal view of him?

A.      Yes, it is. . . .

. . . .

Q.      Did you find him always to be honest in his dealings with you?

21

A.      Yes.

Bluth Testimony, at p. 172 l. 24 – p. 173 l. 14.  (D.E. 275.)

**Government Witness Margaret Houston:**

Q.      And you have found him to be an honest and straight person, right?

A.      Yes, indeed.

Q.      Very forthright with dealings with you.

A.      That's correct.

Q.      Someone you could rely upon.

A.      One more time?

Q.      Someone you could rely upon.

A.      Yes, of course.

Houston Testimony, p. 30 ll. 8-16.  (D.E. 280.)

The *government's* key witnesses have all testified that Alan Miller made every attempt to comply with the law and that he acted at all times with integrity.

**2.      In Sum, the Government Has Failed to Show the Most Essential Element of a Conspiracy – an Agreement to Break the Law.**

The sum total of the government's evidence that Alan Miller agreed to use Seven Promotions to evade taxes is this:  Alan Miller misspoke at a deposition regarding the ownership of Seven Promotions.  The government also showed that two documents were sent from Alan's office that reflected that Helio owned Seven Promotions, but it could not and did not show that Alan Miller ever reviewed those stray statements.  Finally, Larry Bluth had a sudden recollection that Alan Miller told him Helio owned Seven Promotions—six years after he gave sworn testimony to the contrary.  That's it.  A misstatement that was emphatically corrected, two careless omissions and shaky, contradicted testimony.  The fact that a few misstatements were made by Alan or someone at his firm does not mean that a reasonable juror could conclude

22

beyond a reasonable doubt that Alan entered into an agreement to defraud the United States. The government's own witnesses have testified that Alan Miller had valid business reasons for every action he took in late 1999, and they have all testified that he acted with the highest integrity. No juror could conclude beyond a reasonable doubt from the whole of the evidence that Alan Miller conspired with the Castronevses without impermissibly "piling inference upon inference." *Anderson*, 417 U.S. at 224.

###### B.    The Government Has Not Introduced Sufficient Evidence that the Acts Alan Miller Did Agree to Take On Behalf of the Castronevses Were Illegal.

The government's failure to prove beyond a reasonable doubt that Helio Castroneves owned Seven Promotions is fatal to the government's conspiracy case for another reason: So long as Helio did not own Seven Promotions, any agreement to send money to that company was not illegal. It is axiomatic that "parties cannot be found guilty of conspiring to commit an act that is not itself against the law." *United States v. Vaghela*, 169 F.3d 729, 732 (11th Cir. 1999). This is because the "elements of the offense of conspiracy are 'an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means.'" *Id.* (quoting *Toler*, 144 F.3d at 1426).

There is nothing illegal or even improper about sending money from the United States to a Panamanian corporation. Doing so is illegal only when it is part of a scheme to defraud the United States of taxes that are due and payable. However, as explained above, the government simply has not proved its allegation that Helio Castroneves owed any taxes on the money that was due (but not paid) to Seven Promotions Corporation because it has not shown that Helio owned Seven Promotions. Therefore, the government's case fails to show the defendants entered into an agreement to commit an illegal act.

**IV.    THE GOVERNMENT HAS FAILED TO PROVE THAT ALAN MILLER AIDED AND ABETTED HELIO CASTRONEVES'S ALLEGED TAX EVASION.**

The government has charged Mr. Miller in Counts Three, Four, and Five with aiding and abetting the tax evasion of Helio Castroneves in the tax years 2000, 2001, and 2002. Those are the years that the payments were supposed to be made from Penske Racing to Seven Promotions under the Licensing Agreement before Alan Miller halted those payments.  In order to prove tax evasion, the government must show beyond a reasonable doubt "(1) the existence of a tax deficiency, (2) an affirmative act constituting an evasion or attempted evasion of the tax due, and (3) willfulness."  *United States v. Carter*, 721 F.2d 1514, 1538 (11th Cir. 1984).  The government has not alleged or shown that Alan Miller evaded any of his own tax obligations, so the charge against Mr. Miller must be that he aided and abetted Helio's tax evasion.  "To prove aiding and abetting, the government must demonstrate that a substantive offense was committed, that the defendant associated himself with the criminal venture, and that he committed some act which furthered the crime."  *United States v. Hamblin*, 911 F.2d 551, 557 (11th Cir. 1990). Moreover, "the government must show that the defendant shared the same unlawful intent as the actual perpetrator."  *Id.* at 558 (emphasis added).  The government has shown neither that Helio had a tax deficiency as a result of the Penske transaction nor that Alan Miller had any unlawful intent with respect to Helio's taxes.

**A.    The Government Has Failed to Prove Beyond a Reasonable Doubt the Existence of a Tax Deficiency.**

The government cannot prove that Mr. Miller aided and abetted the evasion of Helio's income taxes unless it proves that the acts taken resulted in a tax deficiency.  The government has failed to show this essential element of the charged crimes.

It is undisputed that neither Seven Promotions nor Helio Castroneves ever actually received any money from Penske Racing pursuant to the Licensing Agreement.

24

Therefore, Helio Castroneves was required to include money from the Licensing Agreement in his gross income in 2000, 2001, and 2002 only if (1) Seven Promotions constructively received the money from Penske Racing and (2) either (a) he owned the corporation or (b) it was his nominee. The government has failed to show each of these requirements.

First, the government has failed to show that Seven Promotions constructively received any money from Penske Racing. Through the interference of an unrelated third party – Alan Miller – Seven Promotions did not receive income that was due to it under the Licensing Agreement. The doctrine of constructive receipt may apply when a taxpayer rejects income that is rightfully his, but it does not apply when a taxpayer (in this case Seven Promotions) fails to receive income due to it because of the interference of an unrelated third party.

Second, as stated above, the government has failed to prove either that Helio owned Seven Promotions or that it acted as Helio's nominee.

The government has not proved that Helio Castroneves owned Seven Promotions, and therefore it has not proved that Helio erred in not reporting the income due to Seven Promotions from 2000 to 2002.

**B.   The Government Has Not Proved that Alan Miller Acted Willfully.   No Reasonable Juror Could Find Beyond a Reasonable Doubt that Miller Failed to Act in Good Faith.**

The government has failed to meet its burden of showing that Alan Miller willfully aided and abetted the alleged tax evasion of Helio Castroneves – that is, that he committed a "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 200 (1991). The evidence shows that at all times, Alan Miller acted in good faith to comply with the tax laws. A good faith belief that one's conduct has complied with the tax law precludes a finding of willfulness. *See United States v. Cancelliere*, 69 F.3d 1116, 1122 (11th Cir. 1995) (quoting *United States v. Harris*, 942 F.2d 1125, 1130 (7th Cir. 1991)).

The law does not require a 100% certainty in the tax position that a lawyer advises his client to take.  Far from it.  At the times relevant to the Penske transaction, the IRS ethical regulations governing tax practice required that tax return preparers have only a one-third possibility of success on the merits of any position they recommended to their clients.  *See* Circular 230, 31 C.F.R. Part 10 (1999).  The government has failed to show beyond a reasonable doubt that the position taken by Helio Castroneves did not have a one-third chance of being upheld.

Throughout this transaction, Alan Miller did everything he could to refer his client to tax advisors who had far more tax expertise than he did, to provide those tax advisors with the relevant facts, and to ensure that those facts were correct.  Miller referred Helio to the accountants at Larsson, Woodyard and Henson and the tax lawyers at Feingold & Alpert.  He did so because both firms were intimately familiar with the business and tax issues that affected race car drivers.  Mark Berg testified that Alan Miller came to him and Fred Feingold because they had "real expertise" when it came to the tax issues surrounding deferred royalty plans.  Berg Testimony at p. 180 l. 14.  (D.E. 283.)  Fred Feingold has been practicing law for almost forty years, and he has spent thirty-five of those years working on international tax treaty issues.  Feingold Testimony at p. 100 ll. 18-21.  (D.E. 285.)  Miller also made sure that the accountants communicated with the tax lawyers and were able to rely on their expertise.  Kevin Savoree testified that he contacted Fred Feingold, "a top tax attorney in New York City," to make sure that he was complying with the tax law on Helio's transactions.  Savoree Testimony at p. 62 l. 22. (D.E. 267.)

Once Alan Miller had referred Helio to experts who could help him, Alan made every effort to ensure that they were given the facts so that they could make proper legal

determinations.  First, Alan Miller accompanied Helio Castroneves to his meeting with Feingold and Berg.  Feingold and Berg spent nearly an hour and a half discussing with Helio the importance of the ownership of Seven Promotions.  Berg Testimony, pp. 50-53.  (D.E. 283.)  At that meeting, Helio told the tax lawyers that he did not own Seven Promotions.  Alan Miller, like the tax lawyers, was entitled to rely on this representation from his client.

But according to the tax lawyers, Alan Miller didn't rest solely on Helio's representation at that one meeting.  He continued to work on the issue of the ownership of Seven Promotions because he understood the importance of the issue.  Mark Berg testified that Alan Miller first told him that Helio's father was a voting trustee of Seven Promotions, and he later clarified that Helio's father had a power of attorney over Seven Promotions.  *See* Berg Testimony, p. 46 ll. 14-25.  (D.E. 283.)  At his own initiative, Miller sent Helio a letter and asked him to confirm that Helio did not own Seven Promotions, and Helio confirmed that fact in writing.  Miller provided this letter to Mark Berg.  *See* Government Exhibit No. 175.

Berg testified that generally "my impression at the time was that Mr. Miller was – was trying to ensure that the facts were as they  were told to us, and was going through his files and going through whatever else he had available to him.  I don't know exactly what he was doing, but the sense that I got was that he was – he was confirming the answer, given the importance of the question."  Berg Testimony, p. 54 ll. 5-11.  (D.E. 283.)  According to Berg, Miller suggested to Berg and Feingold that they should "flesh out" the ownership issue.  *Id.* at p. 116 ll. 13-14.  Berg testified that it was his impression that at all times Alan Miller tried to get the facts out to him so that he could write the appropriate tax opinions.  *Id.* at p. 186 ll. 1-10.

Fred Feingold agreed with Mark Berg about Alan Miller's diligent attempts to comply with the law:

> Q:     In your dealings with [Miller] professionally over these nine years, did he always make an effort, a diligent effort, to give you all of the information that you felt you needed to render an appropriate tax opinion?
>
> A.     Yes.  And when we asked him a question and he couldn't answer it, he said, give me time, I'll try to find the information, but he always – we felt he always took care and diligence in answering our questions.

Feingold Testimony, p. 114 ll. 6-13.  (D.E. 285.)

It would be natural, after being dragged through a criminal investigation and the stress and hassle of testifying, for these four top tax professionals to bear some personal animus toward Alan Miller.  But the government's testimony has revealed exactly the opposite.  Each of the four has testified that Alan Miller made every effort to find the relevant facts and that they continue to have a high regard for Alan Miller's integrity.

Based on these facts, no reasonable juror could conclude that Alan Miller willfully violated the law.

## V.     THE COURT SHOULD DECLINE THE GOVERNMENT'S INVITATION TO BREAK FROM PRECEDENT BY APPLYING THE GOVERNMENT'S EXPANSIVE AND NOVEL THEORY OF CONSTRUCTIVE RECEIPT FOR THE FIRST TIME ON FACTS LIKE THESE IN A CRIMINAL CASE.

The government's theory regarding the Penske Racing transaction in this case boils down to the following proposition:  The defendants willfully violated the law when Helio Castroneves did not report as income money that neither he, nor any entity that the government has proven he owned or controlled, ever actually received.  In more technical tax terms, the government's case depends on a "double dose" of an obscure tax doctrine called "constructive receipt."  It is undisputed that Helio Castroneves has not *actually* received a dime from the Penske Racing transaction.  So the government alleges that he *constructively* received the money.  From whom?  From Seven Promotions, says the government.  But Seven Promotions never

actually received any money from Penske Racing either.  So the government has concocted the theory of double constructive receipt.  According to the government, Helio Castroneves constructively received the money from Seven Promotions, which constructively received it from Penske Racing – even though neither Helio Castroneves nor Seven Promotions ever actually received a dime from the transaction.

In numerous filings, the defense has invited the government to identify a single criminal case in which a court has applied this double dose of constructive receipt.  The government has not done so.  Counsel for Alan Miller has searched for such a case, and it has found none.  Indeed, the only criminal cases involving constructive receipt that Mr. Miller's counsel have found involve situation where a defendant channels money to a wholly-owned corporation that *actually* receives it.[5]  Here, the government has proved neither that Helio owned Seven Promotions nor that Seven Promotions actually received any money from Penske Racing.

The government's double constructive receipt theory violates the longstanding principle that constructive receipt is to be "sparingly used."  *Gullett v. Commissioner of Internal Revenue*, 31 B.T.A. 1067, 1069 (1935); *see also Lacy Contracting Co. v. Commissioner of Internal Revenue*, 56 T.C. 464, 469 (1971) (stating that constructive receipt "must be sparingly used"); *Hughes v. Commissioner of Internal Revenue*, 42 T.C. 1005, 1014 (1964) ("It is settled law that the doctrine of constructive receipt is to be applied sparingly.").

The Court has heard the government's evidence, and that evidence does not support the theories that the government has advanced.  There may be cases where a criminal application of a single dose of constructive receipt is appropriate, but this is not one of them.

---

[5]   These cases are *United States v. Plitman*, 194 F.3d 59 (2d Cir. 1999), and *United States v. Willner*, No. 07 Cr. 183 (GEL), 2007 WL 2963711 (S.D.N.Y. Oct. 11, 2007).

The Court should not permit the government to submit this unsupported and unprecedented theory of criminal tax evasion liability to be submitted to the jury.

## <u>CONCLUSION</u>

Any reasonable juror <u>must</u> have a reasonable doubt as to the case against Alan Miller[6] for the following reasons:

- The government must prove that a conspiracy existed and that Alan Miller agreed to join it.  It has totally failed to do so.

- The government's own witnesses have undermined its theory of the case.

- The government has not introduced any evidence that Alan Miller was involved in the Coimex transaction, the Hugo Boss or TAM Airlines transactions, or the deductions taken by Castroneves Racing.

- There is no evidence that Alan Miller agreed to defraud the United States.  No witness statement.  No wiretap.  No formal agreement.  No email suggesting an agreement.  No file memo laying out an agreement.  No handwritten note of an agreement's terms.  Nothing.

- It is undisputed that on December 15, 1999, Alan Miller took actions that ensured that Seven Promotions would never receive a dime under the Licensing Agreement.  Alan's actions to ensure that Seven Promotions never received any money from the Licensing Agreement show that Alan Miller never agreed to use Seven Promotions to defraud the United States.

- Alan Miller stopped the payments to Seven Promotions because of his concerns about ambiguities in the contract between Helio Castroneves and Seven Promotions, not because of tax issues.

- Mark Berg testified that he, not Alan Miller, characterized the relationship between Seven Promotions and Helio Castroneves as a "dispute."

- Alan Miller hired the best tax experts for his client, the accounting firm of Larsson, Woodyard and Henson and the law firm of Feingold & Alpert.  Alan Miller worked diligently to ensure that those experts had the information they needed to do their jobs.  The experts testified that Miller worked to "flesh out" the key facts for the tax decisions that were made.

---

[6]    This motion is being filed before the government's final witness, Joann Levitt, testifies.  Counsel for Mr. Miller reserves the right to address orally in court her testimony and any evidence she presents.

- Each <u>government</u> witness has testified that Alan Miller is a man of honesty and integrity.  It would be inconceivable for a reasonable juror to believe that a 60-year old lawyer with an unblemished record agreed to take on a twenty-four year old client within a couple of hours, or at most a few days, of meeting him to help him cheat the government.

- The government has not proven that Helio Castroneves owned Seven Promotions. In fact, the evidence the government has introduced proves that Helio does not own Seven Promotions; his father does.

- The misstatements identified by the government are unreliable and insufficient to prove that Alan agreed to defraud the United States.  Miller corrected his misstatement at his deposition, there is no evidence he drafted or reviewed the mistakes on the Promotional Representation Agreement or the Guido Chipy loan application, and Bluth's testimony is inherently unreliable.

- The government and the IRS are asking the Court to do something that has never been done before – to apply the doctrine of constructive receipt, which decades of court decisions have held should be "sparingly used", in a criminal context where the fact do not warrant it.  Having heard the government's evidence in this case, the Court should not sanction this break from precedent.

For the foregoing reasons, the Court should enter a judgment of acquittal for Defendant Alan R. Miller on Counts One, Three, Four, and Five.

Respectfully submitted,

*/s/ Lilly Ann Sanchez*
LILLY ANN SANCHEZ
Fla. Bar ID No. 0195677
FOWLER WHITE BURNETT P.A.
Espirito Santo Plaza
14th Floor
1395 Brickell Avenue
Miami, Florida  33131-3302
Tel. (305) 789-9279
Fax (305) 789-9201
lsanchez@fowler-white.com

Robert S. Bennett
Carl S. Rauh
David B. Leland
David W. Foster
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 New York Avenue, NW
Washington, DC  20005
Tel. (202) 371-7000
Fax (202) 393-5760

*Attorneys for Defendant Alan R. Miller*